Good morning, everyone. The panel has three cases on its agenda for this morning, and the first one is Krahling v. Merck, appellate number 23-2553. Good morning, Your Honors. Good morning. My name is Gordon Schnell. I'm with the firm Constantine Cannon, and we represent the relator appellants in this appeal. I'd like to reserve four minutes for rebuttal, if I may. That'd be granted. I may please the Court. So the issue on this appeal is whether the relators have provided sufficient evidence of materiality to get to a jury. Counsel, before you, we just want to make sure what the case is not about. And the first thing is this case isn't about the safety of the vaccine, correct? That is absolutely correct, and that's actually one of the facts the judge got wrong below. In trying to impute certain obligations on the government in taking action or not taking action, he pointed to the safety considerations. And that is not an issue in this case. This is purely about the protection, issues of protection and effectiveness. Okay. So when we use certain words, I want to make sure we're all using the words the same way. Because a layperson may think potency means one thing, but we know in this context potency means the amount of live virus in the product on a particular point, in a particular point in time, how much is put in the beginning, and whether at the end of its, quote, shelf life, it's the same amount. Are we on the same page? We are on the same page, and the potency directly correlates to the level of protection the vaccine affords. Okay, and your position is you're not saying it doesn't provide any protection. You're saying it may not provide the protection as the label may have conveyed and what the CDC may have believed. Exactly.  Okay, counsel, thank you. Okay. So the district court found that the relators did not provide sufficient evidence of materiality. And in terms of materiality, what we're talking about here is Merck selling the CDC vaccines that had potency problems that Merck recognized that the highest levels of the company were so serious that if Merck did not fix them, it was not going to be able to continue selling the product. And materiality also relates to the clinical trial fraud that Merck engaged in to cover up these potency problems. Our relators were the virologists, some of the virologists in the lab at the time seeing this fraud firsthand. Merck literally crossing out numbers on data sheets and making up new numbers just so it could get the results it needed. District court found we didn't provide enough evidence of materiality to even get to a jury, despite the substantial evidence of materiality that we provided, including testimony from former and current CDC officials, the potency agency here, who testified to the critical importance of the requirements at issue and that the CDC would not even consider purchasing these vaccines if these requirements weren't complied with. Well, let's be a little more specific about requirements, because the CDC testimony, the 30B6 equivalent of their witness, said that the most important consideration is effectiveness. Correct. And when asked about issues of potency, as I've just described the agreed upon definition, that was not among the things that that individual said was of a consideration. Actually, one of the 30B6 witnesses, Palanch, testified that potency is absolutely, his words, absolutely relevant to effectiveness and the amount of potency directly correlates to effectiveness. So doesn't the CDC, though, do its own effectiveness and evaluations outside of what the company does? Yes, and that's a fact that both Merck and the district court rely on heavily, this so-called 88 percent effectiveness number. First of all, let's put it in context. That is not an average effectiveness. That is a median effectiveness that was done through what the CDC itself describes as limited studies, and we cite that in the brief. And these limited studies have made the CDC recognize that it needs more studies to get behind it. But they continue to recommend this vaccine, and they continue to represent that the results of their effectiveness study is less than what Merck said it was, but still worthy of recommendation. Am I correct? That is correct. And for the bulk of the relevant period here, Merck was the only supplier. It was the only choice for the CDC to vaccinate millions of children a year for measles, mumps, and rubella. And so it's not surprising that Merck would be, I mean, that the CDC would continue recommending this vaccine. What should we make of the fact, then, that now that there is a second vaccine that's out there, they're still purchasing the MMR2, maybe it's another one now, from Merck? You could draw an inference that it means that the CDC doesn't see a problem, or you could also draw an inference that as soon as an alternative vaccine was available, the CDC has started shifting its purchases away from Merck. Now, to say, well, they didn't shift it immediately away from a supplier of 50 years to a brand-new supplier, when the CDC itself has recognized a vital need to have multiple suppliers in this space to deal with supply, potential supply interruptions, and to foster competition, it goes both ways. And that's exactly the type of dual-sided inference that is for a jury to decide, not for a court to decide. But the CDC considered both vaccines interchangeable, and as my colleague said, is buying from both of them. So doesn't that demonstrate that the representations made by Merck were not material to the decision of the CDC to purchase the Merck product? We don't believe so at all, Your Honor. I mean, let's talk about this gets into the broader context of government inaction, which really was all the district court's decision was about, government inaction. And you don't even consider government action in a materiality assessment unless there's actual knowledge of violations. And the district court ignored the statements of the government at the argument below, very forceful statements of the government below, that it absolutely does not have actual knowledge of all the facts, let alone of violations. But the DOJ lawyer who was making those representations said, we knew lots of things, we just didn't do a synthesis. And let's talk about other things that the district court did have in the record. It knew that in the 1990s, when the Childhood, the National Childhood Vaccination Injury Act was in place, there were reviews of the product. It knew of the warning letters and the FDA 83. It knew of the relators complaints. It had an opportunity to do its due diligence and declined to intervene. The CDC had to prepare rule 36 witnesses who had to educate themselves on the factual topics called for by the notice. And then in 2019, the plaintiff's experts information in part was shared with the relevant government actors. So I don't know how we can say the district court's conclusion is not the only one that could be drawn concerning knowledge. So tell me why all those things do not demonstrate that that conclusion was the only one that could be reached about knowledge. OK, so we heard what the DOJ lawyer said below. It's just not true. Adamant that it's presumptuous to assume that they have all the facts. And he said they do not have all the facts, let alone violations. They have not reached a determination. But it wasn't just the DOJ lawyer. We deposed two CDC witnesses. We asked them, has the CDC reached a determination on the merits of this case? They both said no. The subject matter expert from the CDC who was put up. We asked if he had knowledge of the underlying facts of this case. He didn't. This was the witness that the CDC put up. We asked him about protocol seven. Didn't really know anything about it. Just give me the name of the witness you're referring to. Blanche. You're still talking about Blanche. Yeah. We asked him about is he aware of any potency issues? He wasn't. He wasn't even aware that Merck had to double the potency of its vaccine when all these problems arose. You talked about the FDA. The FDA knew there were some potency problems. That's why it directed Merck to double the potency back in 1999. Had to double the potency to fix the problem. It didn't fix the problem. Merck never told the FDA. Can I just dig into that a little bit? Can you help me understand with protocol seven what the extent of the FDA's involvement in that study? Yeah. That's another fact that the district court got wrong. The district court said that Merck cooperated with the FDA during the study. There was some cooperation for sure, but Merck did not share the fraud with the FDA. Our relators were there before the FDA inspection when the head of the lab got garbage bags filled with cell plates and threw them into the incinerator so that the FDA wouldn't find it. So look, we can go back and forth. Merck will take a different position. But these are hotly disputed questions. Our position is very firm that the FDA does not have actual knowledge and never had an actual knowledge. So your position on the protocol seven is that the FDA had some involvement, but there were some misrepresentations about the study. What were precisely the misrepresentations about that study? The main misrepresentation was that it was an accurate and reliable measure of protection. That was the whole point of the study, to see if a lower potency dose of the vaccine would work just as well, so that they could lower the potency specification and get back into compliance. And your position is that Merck did not inform the FDA of what you just said? Absolutely. And it's not just our position. It's the record has substantial evidence backing that up, including the firsthand account of our relators. So we talked about the inspection. Let's talk about the warning letter. Now, the warning letter, and by the way, this is all about FDA knowledge. What really matters is CDC knowledge. The FDA knowledge is important to show Sienter as a backdrop to what's really going on here. But for the materiality analysis, and Merck's counsel agrees, specifically said so below, that this is all about obligations between Merck and the CDC. But I want to answer your question about the FDA. The warning letter shows how important these potency issues were to the FDA, because the warning letter was prefaced with, if you don't satisfactorily address this, we're going to threaten you with revocation of your license. And so Merck said, assured the FDA that everything is fine, we've doubled the potency, everything's fine. Meanwhile, we have a slew of internal e-mails during the same period and going on for years, where Merck recognized internally, and we have all those quotes in our brief, where they were out of compliance still, and it was misbranded, and we needed to take immediate corrective action or we're going to be subject to a recall and we're going to be blocked from continuing to sell the vaccine. They didn't share any of that with the FDA at all. And in terms of the CDC getting the warning letter, which the district court kind of suggested, and Merck keeps saying the CDC got the warning letter, we asked both CDC witnesses, did you ever get this warning letter? No. So there's really an issue with actual knowledge. But let's keep going on this side of the equation, on the immateriality side of the equation. Let's assume that the government had actual knowledge. The next thing the district court was supposed to do was not just look at action the government hasn't taken, but look at action the government has taken. We've already talked about immediately shifting purchases away from Merck towards the CDC. I'm going to let you finish that statement, and then we're going to head over to your part. Okay. So we've already talked about the immediate shift of purchases. Dual inferences, definitely dual inferences can be drawn from that. And on summary judgment, we get the benefit of all inferences. The district court continually gave them to Merck. But there's other. The government has joined the call for a new vaccine. 88% effective keeps bandying about. This vaccine has problems. There are outbreaks that the CDC for years is trying to get their arms around, and they have funded vaccine research for a new vaccine. You're over your time. Okay. I apologize. We'll see you on Roboto. Thank you, Your Honor. We'll hear from counsel for Merck. I get carried away sometimes. We understand. We've been there. Can we ask for some order in the courtroom, please? Counsel will hear you. Good morning, Your Honors, and may it please the court. Jessica Ellsworth for the appellee Merck. The materiality element of a False Claims Act case looks to the likely or actual effect on purchasing decisions. It requires evidence that the asserted breach or violation likely would or did affect the CDC's decision to pay for Merck's vaccine. Your adversary suggests that certain information wasn't made known to the decision-makers on purchasing, and as a result, they would not know how to change their buying behavior. How do you respond? The first thing I would say, and I think both sides agree on this, and the government even agreed at the summary judgment hearing below, is that the key driver for the CDC's purchasing decisions is vaccine effectiveness, real-world effectiveness. And that makes sense because CDC's mission is to reduce vaccine-preventable diseases in our country. So the CDC has consistently evaluated the effectiveness of this vaccine in the real world with a median effectiveness at 88%. And in the submissions that went to the CDC by Merck, you can see there's an Appendix 5 to Merck's submission that lists all of those effectiveness studies, the public effectiveness studies that are out there, and also walks through additional effectiveness information that CDC itself has put out. So just to be kind of succinct about what are those studies, are they independent data collection? Are they review of somebody else's collection of data? Is it outbreaks? Give us, for the benefit of all of us, just a thumbnail of what those studies are for us to know that the CDC actually had good basis for its effectiveness conclusions. So the effectiveness conclusions are actually analyses that are done by CDC themselves in conjunction with state and local public health officials. And then there are academics who also are involved in this process of putting it together. The entity that is not involved in those effectiveness analyses is Merck. The manufacturer is not involved in that. This is something the CDC develops itself. And if you look at that appendix in the Kessler submission, it explains that in evaluating effectiveness in the real world, what the CDC and the state and public health officials are looking at is given the particular strain in a particular outbreak, what is the difference in what's called the attack rate between fully vaccinated and unvaccinated individuals? And the CDC has consistently, to this day, if you look at the CDC's website, evaluated that at an 88% median effectiveness. Do you agree that that's not the same rate that was achieved in the clinical trials, correct? I would agree. And, Your Honor, the CDC witnesses themselves were very clear that that is a common occurrence. A clinical trial setting is different from a real world setting. And so the difference, and it's not a huge difference, it was 96% in the original clinical trials, and it's 88% is what the CDC is finding is the median in the real world. But CDC says that's what we expect, real world. You're accepting your statement that the CDC has said it is 88% effective and that that's based on their own independent study. Essentially what I hear your friends on the other side saying is, listen, what you're asking us to hold is that misrepresentations about a vaccine's potency and efficacy, not effectiveness, efficacy, are immaterial. Why is that wrong? So that is wrong for a number of reasons. And I think it helps to walk through the factors, which is exactly what Judge Kenney did below, that the Supreme Court set out for evaluating whether any alleged breach or regulatory violation is material. Before you do that, just so everybody's using the language in the same way, we talked about what potency means. You agree with what we had the conversation with your colleague, correct? Efficacy, when you use that word in this context, tell us what you mean, and then I'll let you continue with your answers. Versus effectiveness. Thank you. Certainly. It gets at the exchange that Judge Schwartz and I were just having about a clinical trial versus real world. So efficacy is what a manufacturer has to show in order to get FDA approval of a new drug or vaccine. You have to show that the drug is efficacious. And you use clinical trial data to do that. When you say efficacious to mean efficacy, tell us what that means, that it works? That it works, right. In the clinical setting. In the clinical setting, that's right. And effectiveness is a different evaluation. That's the real world analysis that CDC does. When there is an outbreak setting, how does this vaccine work for people who are fully vaccinated? So those, I think, are the differences. What Judge Kenney did was walk through the factors, the non-exhaustive factors that the Supreme Court set out in Escobar. This court has referred to them as well in its decisions, starting with is there an express condition of payment that relates to anything that the relators are saying is at issue? And the answer to that is no. They don't identify anything in any contract, in any regulation that sets out an express condition of payment. That's different from Druding, which is the case the relators rely on most heavily, where there was in fact an express condition of payment set out in a regulation for that. That case involved payment for hospice care. And there was an express regulation requiring certain documentation in order to obtain payment for hospice care. What the court looked at below was effectiveness. It's not an express condition of payment, but it is what the CDC witnesses said were most effective. And everyone agrees on this 88% median effectiveness number. The relators aren't challenging that the vaccine was less than the median of 88% effective. They're not raising any issue about that. The other thing the relators point to are what they call prerequisites for contract purchasing. And there are two problems with those prerequisites. One is that they all relate to things that the FDA is tasked with evaluating, not the CDC. And I think it's important to remember the FDA and the CDC are both public health agencies. They're both part of HHS, but they have different missions. The FDA is responsible for labeling. It's responsible for licensing. It's responsible for stability testing. It's responsible for manufacturing practices. The CDC isn't coming in behind the FDA to evaluate those things that are in FDA's purview. What the CDC is looking at is whether there has been a reduction in vaccine preventable diseases. It's tracking diseases. It's trying to protect people from health threats. So when the relators tell you there was some CGMP, which is the manufacturing practices problem, that is something that FDA would evaluate. This is important because the relators disclaimed any theory of fraud on the  They have limited themselves to just the CDC. Well, that means this CGMP theory really is irrelevant to the CDC's materiality determination. The contractual shelf life. There is no allegation or proof that any vaccine was delivered to CDC with less than the 12 months required until the expiration date for that lot. Licensure, again, that is something that CDC does not monitor. That is something that FDA monitors. They look for a license. They look for the fact of a license, but they're not reevaluating whether or not that license, whether FDA should have approved that license, or FDA should allow that license to remain in effect. What about the factor relating to government action or inaction? As I read the Supreme Court in our case law interpreting it, it tells us, it answers one thing. It seems to premise on some degree of actual knowledge, but the aspect that it doesn't necessarily answer is aperture in terms of how long should we look at government action? Your friend on the other side seems to say, you can't just drop everything and change your purchasing decisions. What's the window? I guess my thought is, do you agree about actual knowledge, part one? Probably going to get to that because it's kind of big. Then part two is, how big is the window for looking at government action or inaction? Is it case by case? What guideposts do we have in that respect? Your Honor, I think in this case, both the government action and the government inaction, which the district court analyzed both of those, point in the same direction. Really, it doesn't matter how wide or narrow of an aperture you take, because if we go all the way back to the relator's position that they saw miscounting of plaques, the little holes, in the original PRN that was part of Protocol 7, FDA was informed of that. It evaluated at the time. That PRN count was never used in anything. FDA said, don't use it. In the end, everything that happened with Merck's mumps vaccine used ELISA data, which was a different study that the relators had no involvement in. So that's if we start at the very beginning. But if you come all the way through to today, and I think this is important, Judge Phipps, there is some context specificity to how you look at government action and inaction. This is a vaccine that CDC annually renegotiates a contract for. So we have the fact that there have been 24 annual contracts negotiated since relators first raised their complaints about the way that plaque counting was being done in Protocol 7. And if we look at what hasn't changed in that intervening 24 years, CDC and FDA's public statements of support have not changed. CDC's purchases have not changed. FDA approved a new vaccine two years ago, manufactured by GSK that uses the very same ELISA assay that Merck used. CDC then found that that vaccine was fully interchangeable with Merck's vaccine. No one at either agency has asked Merck to reprove the bona fides of its Merck's vaccine. Neither agency has asked Merck to send a dear doctor letter to providers suggesting there is some concern about the vaccine. No one has rescinded FDA's approval. They haven't asked Merck to conduct additional research trials. They haven't asked Merck to unbundle the vaccine. Could your answer be different if GSK wasn't on the market? Because one of your adversary's arguments is the CDC, I think their language was customer by force. Some could say no other game in town. There were no other alternatives. Would your position be different if we didn't happen to be hearing this case after GSK, and I'm sure we're going to hear more about that subject in the next case, enter the market? It wouldn't be any different, Your Honor. I think that GSK's entry to the market and the fully interchangeable determination by CDC is additional support showing that the relators can't establish materiality. But even if we go back to the time before GSK was on the market, FDA had allowed GSK to use the same ELISA assay that Merck had used. And so even before GSK was on the market, we have an indication after Dr. Kessler's submission has gone in, and Dr. Kessler has said to the head of FDA, this ELISA assay, it has no clinical relevance. Merck shouldn't have been allowed to rely on this. You shouldn't do anything based on this ELISA assay. And the next year, FDA says to GSK, go ahead and use that ELISA assay. Should a jury be the one to decide whether or not the CDC would have behaved differently had it known all of the information your colleague suggested it did not know? In order for that to happen, Your Honor, there has to be enough evidence that the jury could come out either way. And that's why I think if you look at the Druding case, where this court did reverse a finding of lack of materiality, it's really important that the court analyzed that there were materiality factors pointing in both directions. Well, also in Druding, I think Druding is different also because it was not clear when the government had whatever the important knowledge was. Was it before or after they actually made the payments for the services that were being charged, right? That's right, Judge Worse. And what was really important about that is that the government, in the appeal in this court, the government filed a brief to say that the district court had gotten it wrong on this government knowledge fact. And the government participated in the argument and argued extensively that the district court had misunderstood what the regulatory framework was there and why the district court's finding was incorrect. The government is not here doing that today. So we have a submission by Dr. Kessler that went in. We have almost five years that have passed. We have all this intervening action by the CDC to continue showing... Can you respond to Ravisseri's point about knowledge? My colleague, Judge Phipps, was asking about knowledge, and he said it's no small point. So what's your response to your colleague's assertion the government had no knowledge? So I think the government, I think their assertion is based on what the government line attorney said at the summary judgment hearing, which went beyond what was in the government's statement of interest. And Merck responded to that. You can see this at ECF 340 and ECF 347. And Merck explained the various ways in which that government line attorney got both the facts wrong and the law wrong in his statements that he made to the court. Do you have appendix sites that correspond to what 340 and 347 are? I'm not sure. Because they were briefs, I'm not sure. They were essentially briefs. I would have to confirm if they are in the appendix, but they are. Certainly available and part of the record. I got it. Certainly available. So tell us what did they say? Why do you think that that statement is wrong, and what's your evidence of knowledge based on this record? So the evidence of knowledge, and this is where I think the government attorney's position was wrong. He ignored the CDC's knowledge of effectiveness data, which CDC itself calculates. He ignored the 27-page single-spaced analysis from Relator's Expert that had dozens of exhibits attached to it, making their best case that the CDC should take various actions based on the discovery record in this case. He ignored the publicly available impact data on the reduction of mumps cases over time that have happened as a result of Merck's mumps vaccine. You can see that chart on page 6 of our brief. He ignored the warning letter response that conveyed the potency loss model and the average potency loss and the confidence interval. So just to follow up on this, it strikes me that the formulation of the actual knowledge is actual knowledge that certain requirements were violated. And so it strikes me that a little bit of what you're saying is, hey, there's actual knowledge that things might be working, everything's fine, but the actual knowledge seems to have a tighter nexus. It says, look, actual knowledge of violation, not actual knowledge that violation might not be a big deal or something like that. And so if we want to tie ourselves to the standard, which is actual knowledge of the violation, we've got two agencies are kind of here, and I guess we have to focus on not fraud on the FDA, as you say, but on the CDC. Where do you see actual knowledge of the alleged violation, not actual knowledge that things might be okay with or without a violation, but actual knowledge of the violation? That's how I read Escobar. Is that wrong? I think you're right, that in the context of Escobar, that line is talking about actual knowledge of a violation. Here what we have is actual knowledge of all of the facts that the relators say equate to a violation. And then we have the government's response, which is nothing, to all of those facts. And so I think it's really telling that the relators are suggesting that even though the government, knowing all of those facts, has done nothing, they should be able to ask a jury to somehow second-guess that determination of nothing. It doesn't matter where the actual knowledge comes from, that is. It doesn't matter if it was learned in the context of litigation or not in the context of litigation, through allegations in the litigation or not. And I'm looking back at the Druden case that you are referring to. Your Honor, I think that actual knowledge could come in different stages in different cases. Here we think the actual knowledge comes actually at multiple steps. It goes all the way back to the time when Protocol 7 was initially being conducted in the PRN, that one of the relators went to FDA. I think what my colleague is drawing to your attention is, is knowledge of allegations enough? No, Your Honor, we don't think knowledge of allegations is enough. And that is really why the government's statement of interest, filed below, wanted the court to get the law right, that knowledge of allegations is not enough. That's important, I think, particularly for other cases where we may be at a motion-to-dismiss stage. And so then the question is, why do you have more than knowledge of allegations here? So we have more than knowledge of allegations because we have all of the discovery records in the case, and the CDC here authorized witnesses to participate in discovery. The CDC reviewed expert reports that were written by former CDC and ACIP employees that were serving as experts for Merck, and provided feedback on those expert reports. They received the Dr. Kessler submission, and importantly Judge Sotarski, in authorizing that Dr. Kessler submission, the court order goes out of its way to say the appropriate way to deal with the relator's allegation is to ask these public health agencies, the officials at CDC and FDA, not the lawyers, but the actual officials tasked with their public health mission, to look at what Dr. Kessler's saying, and if anything, in those agencies' evaluation of the record, if there's any public health concern, then those agencies can determine how to act. That Dr. Kessler submission, I think, makes this case quite distinct, and the CDC and FDA's lack of response, they didn't do, as I ran through earlier, that whole list of things that they didn't do. So we commend the magistrate judge for her order, am I right? I think that's right. I think she had the approach that if there was something to see here, she didn't want to make that determination herself. She wanted the public health officials at the CDC and the FDA to have the opportunity to evaluate, and there was no limits on what Dr. Kessler was allowed to include in that. He was allowed to, and his assertions track very much with what the relators have argued in this case, are the problems that they see with Protocol 7 and the way FDA had involvement in that study. We had no other facts. You're saying that just the disclosure, pursuant to the order from 2019, of Dr. Kessler's materials alone would have provided knowledge of factual information that would have been of consideration to the government actors, am I right? Yes, I think that's right. I think whether you look at it alone or you look at it in context of all of the additional involvement that CDC had, and it's telling that the relators focused on two discovery letters that authorized CDC to participate in discovery in this case where CDC said, we have an interest in the outcome of this case, and that's the best that they can point to to suggest that the CDC sees these allegations as material or sees these facts as material. The flip of that letter, I guess, is it also was conveying that they were going to make a equivalent of a 30B6 witness available to testify and an obligation of a 30B6 witness to educate themselves on the facts relevant to this subject. Absolutely, Your Honor. Absolutely, Your Honor. So for all of these... In response to what you're saying about the expert, I think your friends on the other side would say and have said, listen, I understand what you're saying about this, but this is an expert in a litigation. He's a paid expert by Merck in this litigation. Why does that not matter in the context of actual knowledge? So just to be clear, Dr. Kessler is a paid expert for the relators. He's not a paid expert for Merck. He's a former FDA commissioner, so he's not an expert. I apologize. I didn't mean Merck. I just mean in terms of determining whether or not the CDC would react to this. This is in the context of a litigation. This is a paid expert in the context of litigation. So why does it not matter? Why does that fact not matter? I think there are a couple reasons for that. One is that the submission was accompanied by a court order that directed the agencies, if they saw action being warranted in response, to take that action or to evaluate that. The second is that the CDC has a public health mission. It's every day publicly telling families in this country to vaccinate their children using the MMR2 or the ProQuad vaccine, and it would be a pretty dim view of the CDC's compliance with its mission, coupled with the presumption of regularity. And one of the things I note is when the government attorney spoke below, he didn't say anything, and the government's not here saying anything to suggest the presumption of regularity shouldn't be applied to the CDC's lack of response to those actions that Dr. Kessler asked the agency to take. Councilman, to see if my colleagues have any further questions. All right. Thank you very much for your arguments. Thank you, Your Honor.  Just a couple of quick points. First, I want to point out that this case presents an actually more powerful example than the Druden case for reversal. It has much more evidence of a reasonable jury could find supports materiality, and that's the question here, including testimony from current and former CDC officials testifying to how important these issues are, including that the government won't even purchase if these violations are issued. A lot of what my counsel is saying here goes to the ultimate merits of the fraud. We're talking about materiality. It's very interesting to me that the Kessler report is just, you know, when you think about this case, it's a real twist. You know, you rarely get an expert who says, hey, there's a supportive language, you know, things like, you know, significant public health concern. Says that. It's made available. Everyone can consider it. No change. No change in purchasing decision. I mean, that's so unusual. It seems like once that happened, you would expect the CDC to say, we've seen the light, change everything, stop everything. He rang the bell, and there was no change in conduct. That's really hard to make a materiality showing when that happens, right? No, I respectfully disagree. I think the Kessler issue in this case shows why this needs to go to a jury. So the Kessler submission that the district court pointed to, and it wasn't a Kessler submission, it was a joint submission with Merck. Merck had its battery of experts, too, contesting Dr. Kessler every step of the way. And did the CDC get those contested? We don't know what the CDC reviewed. This duty of, this presumption of regularity has never been. We know what the court order was, and the court order only went to your experts. It went. We don't know if they reviewed. But that's not even relevant. That's not even important. What's important is. Well, what my colleague is just talking about is what we understand was presented to the CDC and what impact it had on the CDC or did not. Let's put it in its proper box. Let's say everything the court and Merck is saying about the Kessler submission is true. It went to the government. The government reviewed it. It listened. It sat on it and did nothing. That just goes to the actual knowledge point. But what about the fact that you have a former FDA commissioner who headed up the COVID task force by the White House, one of the leading experts in the country, provided 800 pages of opinion and analysis as to how severe the violations that issue. And again, what was the violation? My colleague, Judge Phipps, was asking your adversary about violations. CGMP is one of the biggest. That's not an FDA-only requirement. It's in the contract with the CDC. It's in the regulations. Among the rules, it's not just about manufacturing. It goes directly to potency. The CGMP requires sufficient potency through shelf life. That's the issue here. But here, the shelf life by contract was 12 months. And there's no anything in the record that says it was less than 12 months. So the contract expectation was fulfilled. Again, we respectfully disagree. Among all the documents that we cited, and there's plenty more, by Merck's own calculations, they said the vaccine wasn't going to last more than 12 months. Well, that was the contract. My point is that we're looking at the CDC and what would be, from its point of view, the important information it needs to continue to purchase. And by operation of the contract, they don't want to look for 12 months. So, again, whether there was 12 months or not 12 months goes to the merits. But the former CDC official, Merck's expert, said the CDC is not going to contract with a supplier who can't meet this requirement. This is the requirement that issued. Can you point to anything in the record that says it didn't meet 12 months? I can point you to the outbreaks that have happened, tens of thousands. I'm asking you about 12 months. It's shelf life. I would point to the evidence from Merck internally recognizing that its vaccines will not last 12 months. Now, do I do this? Why did it not last 12 months or 24 months? 24 months. No, they did internal calculations that said with the potency we have now, it's not going to last more than 12 months. Okay. More than 12. More than 12 months. Thank you. But it's not like it instantaneously goes from the manufacturer to the CDC. I mean, for summary judgment purposes, that's clearly an issue that should be before the jury. But I want to speak, if I may, on Kessler some more. Because Druding and many other courts look to expert opinions as evidence a reasonable jury could find supports materiality. Because it goes to the significance of the violations at issue. My adversary walked through briefly all of the evidence or some of the evidence of materiality that we have. I already said the CGMP, which they say is not important, is critical. Can I just tease this out? It seems to me that my question about the Kessler report went to what I'm calling Escobar kind of prong three, you know, government inaction or action. And it seems that you've pivoted from the Kessler report saying that that really works for Escobar prong two, the substantiality or, you know, whether the violation is minor. And so it seems to me you're saying, oh, we've got the Kessler report works for prong two. But I think I was saying it just is very strange that I'm not seeing how it works for prong three. So it's relevant to both sides, and that's one of the reasons why that is something that the jury should be weighing. But even I want to go through this because I want to make sure it's clear. For government action to count, there has to be actual knowledge. Let's assume there's actual knowledge. I'll give that. I don't agree, but let's assume it. Then you've got to say, all right, was there any action that supported materiality? We have that. We've gone through it. The government's calling for a new vaccine. But let's throw that out. Let's disregard it like the district court did. Then you've got to consider, okay, even with actual knowledge, are there surrounding circumstances that can explain why the government's not taking action? We have that, too, with cutting off a major supplier, moving all its supplies to a new supplier, cutting off vaccines for millions of children. And I want to point out something in the record. When Dr. Kessler and Merck submitted this joint submission and Merck went out of its way to deny everything and say, don't take action, this is a waste of your time, they also said there are other risks if you take action. And one of the big risks of taking action that they pointed to was scaring people away from vaccines. This is a very fraught area, and the government has to be very careful before it takes action. Counsel, I'm going to ask my colleagues if they have any further questions for you. I'm sorry. Can I close with a policy point? I just want you to make your final point. My final point is that the dangerous precedent that the district court would set if left to stand would essentially require the government to take action without full knowledge of the facts, let alone knowledge of violations or reaching a conclusion or give up its rights under the False Claims Act. That's what the district court is setting a precedent for. That would eviscerate the key TAM provisions of the False Claims Act. Here it would have required the government to cut off vaccines for millions of kids or, as I said, immediately shift its purchases to a new supplier despite its vital need for multiple suppliers. Thank you, Your Honor. The court thanks counsel for their arguments. We'll take this matter under advisement.